## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ZAHID KHATTAK,**<br><br>        Plaintiff,<br><br>**v.**<br><br>**AMANDA BENNETT**<br>**Chief Executive Officer,**<br>**In Her Official Capacity**<br>**U.S. Agency for Global Media,**[1]<br><br>        Defendant. | Civil Action No. 19-cv-3231-MAU |

### MEMORANDUM OPINION

Plaintiff Zahid Khattak ("Khattak") filed this case against the United States Agency for Global Media,[2] alleging one count of national origin discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Khattak argues that Voice of America ("VOA" or "the Agency") discriminated against him based on his Pakistani origin when they hired an Afghan, Ahmad Lami, instead of Khattak for an international broadcaster position for VOA's Deewa Service.

Before the Court is the Agency's Motion for Summary Judgment. ECF No. 28. The Parties appeared for oral argument on July 13, 2023. Because Khattak has failed to raise a genuine issue of material fact warranting a trial, the Court **GRANTS** the Agency's motion.

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), the current Defendant has been substituted for her predecessor. *See* Fed. R. Civ. P. 25(d).
[2]     Khattak's employer, Voice of America, falls under the purview of the United States Agency for Global Media.

## FACTUAL SUMMARY

The Deewa Service is a Pashto language news provider that falls under the purview of VOA's South and Central Asia Division.[3]  ECF No. 28-4, Phillips Dep. Tr. 26:4–8; 29:11–17, ECF No. 28-7 at 16.  The Deewa Service broadcasts to Pashto speakers living in the Afghanistan-Pakistan border region.  *Id.* at 26:4–8; 29:11–17.  Within the South and Central Asian Division of VOA, Akbar Ayazi[4] was Division Director and Eric Phillips was the Deputy Division Director. ECF No. 28–7 at 16.  Nafees Takar was the Service Chief for the Deewa Service.  *Id.*

Khattak is of Pakistani national origin.  ECF No. 33-1 at 2.  At the time of his application, Khattak worked for the Deewa Service as an independent contractor, a position he held since 2009. ECF No. 28-6 at 3.  Prior to this position, Khattak had no other experience in broadcast journalism. *See id.*; *see also* ECF No. 28–5, Khattak Dep. Tr. 34:19–25.  On December 19, 2016, VOA's Deewa Service announced a position for a full-time international broadcaster, and Khattak subsequently applied.  ECF No. 33–1 at 2, ¶ 1; ECF No. 28-8 ("First Vacancy Announcement").  VOA sought candidates with "a proven track record as a journalist with experience writing/adapting stories that are unique, comprehensive and have global or original appeal," working to deliver stories to Deewa's target audience.  ECF No. 28–8 at 1.  In the First Vacancy Announcement, the VOA listed a variety of non-exhaustive duties and noted that it would evaluate prospective candidates based on several criteria, including English and Pashto proficiency and knowledge of the target area.  *Id.* at 3.  The position description provided that, "[t]he incumbent conceives, writes, translates (English to Pashto targeted to the Northwest Frontier Province)," and as part of the major duties,

---

[3]     Voice of America's South and Central Asia Division houses multiple language services with overlapping target audiences, including VOA Afghanistan that broadcasts in Pashto and Dari, and VOA Urdu that broadcasts only in Pashto in Pakistan.  *See* ECF No. 28-4, Phillips Dep. Tr. 182:11–14, 181:13–183:9; *see also* ECF No. 28-5, Lami Dep. Tr. 9:15-21.
[4]     Akbar Ayazi passed away in 2019.  ECF No. 28–11.

"[t]ranslates and adapts complex English texts into idiomatic Pashto appropriate for international broadcasting."  ECF No. 28–10 at 2.  After soliciting applications, Nafees Takar, the selecting official at the time, picked Khattak along with another candidate, Sher Bunairee, for the vacancies. ECF No. 28-12 at 2–3.  On January 17, 2017, Ayazi sent a memo to VOA executive Kelu Chao signing off on Khattak's selection.  ECF No. 33-9 at 14.  Later that month, the federal government instituted a hiring freeze, forcing VOA to rescind the job offers to Khattak and Bunairee.  ECF No. 28–13 at 3; ECF No. 28-3 at 9, Khattak Dep. Tr. 52:23-25–53:1.  Ultimately, Ayazi requested that VOA's Human Resources Department relist the international broadcaster position at the Deewa Service.  ECF No 33-9 at 19.

On September 19, 2017, VOA posted another vacancy announcement ("Second Vacancy Announcement") for the same position at the Deewa Service.  ECF No. 28-14.  The Second Vacancy Announcement was substantively the same as the first, except that VOA was only seeking to hire one candidate due to budget constraints.  ECF No. 31-1 at 3, ¶¶ 7-8; *see also* ECF No. 28-1 at 8-9.  Eric Phillips, the Deputy Division Director, selected Melek Caglar, Hasib Alikozai, and Navbahor Imamova to serve on an interview panel for this hiring process.  ECF No. 28-4, Phillips Dep. Tr. 107:9-15; *see also* ECF No. 28-16.  After conducting interviews, the panel unanimously recommended Ahmad Fawad Lami as one of the "two most suitable candidates" for the new position, along with an American national, Niala Mohammad.  ECF No. 28-16; ECF No. 33-4 at 26.  After receiving the two recommendations from the interview panel, Phillips forwarded them to Takar to select a candidate.  ECF No. 33-9 at 31; *see also* ECF No. 28-4, Phillips Dep. Tr. 116:6–9.  Takar refused to select either candidate and requested to see the third- and fourth-most qualified applicants.  ECF No. 33-9 at 31.  The panel responded that Lami and Mohammad were the only two qualified candidates.  ECF No. 34-7 at 7 (citing Phillips Dep. Tr. 127:6–21).  Takar

subsequently issued a memo explaining why he did not want to select Lami or Mohammad for the position, stating that his preferred candidate was Bunairee, who had been tentatively selected for the position before the hiring freeze.  ECF No. 28-19; *see* ECF No. 28-18 at 2.  VOA did not proceed with a selection after Takar refused to follow the recommendations of the panel.  ECF No. 28-18 at 2.

On February 12, 2018, VOA posted yet another (and final) vacancy announcement ("Third Vacancy Announcement") for the same international broadcaster position.  ECF No. 28-20.  This announcement was substantively the same as the previous two.  *See id.*; ECF No. 31-1 at 5, ¶¶ 21–22.  Although Lami and Khattak applied for this position, VOA conducted no further interviews.  ECF No. 28-1 at 11–12.

In March 2018, Phillips and Takar met to discuss the list of candidates who had applied through the Third Vacancy Announcement.  ECF No 28-1 at 12.  At this meeting, Takar allegedly told Phillips he did not want to hire an Afghan for the position.[5]  ECF No. 28-4, Phillips Dep. Tr. 137:7-10.  Phillips reported these comments to Ayazi and, after consulting with Human Resources, Ayazi removed Takar as the Selecting Official and issued a Letter of Reprimand.  ECF No. 28-18.  Ayazi then made Phillips the Selecting Official.[6]  ECF No. 34-1 at 20.

On April 2, 2018, Phillips selected Lami based on a recommendation from the interview panel.  ECF No. 28-22.  The interview panel cited Lami as the stronger candidate because of his "considerable experience as a journalist."  ECF No. 28-4, Phillips Dep. Tr. 188:10–15.  VOA

---

[5]     Takar disputes this characterization of their conversation and claims that he said he "would not like an Afghan panel as [he saw] several candidates [of] Afghan origin."  ECF No. 28-21 at 1; *see* ECF No. 28-15, Takar Dep. Tr. 204:4–205:21.

[6]     According to Phillips, Ayazi justified his decision to appoint Phillips as the new Selecting Official by explaining that he wanted to avoid the appearance of favoritism, as he had personal relationships with certain individuals who worked at VOA's Afghan Service.  ECF No. 28-4, Phillips Dep. Tr. 139:4–141:20

justified its selection of Lami based on his extensive work as a journalist in the region.  *See* ECF No. 33-2 at 5-6, ¶¶ 24-26.  On April 12, 2018, VOA offered Lami the position.  ECF No. 33-1 at 30, ¶ 246.  On May 10, 2018, VOA sent Khattak an email informing him that he was not selected for the position.  *Id.* ¶ 247.

## PROCEDURAL HISTORY

On October 2, 2018, Khattak filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that his non-selection was discriminatory.  ECF No. 1-1 at 7, ¶ 51.  On August 5, 2019, the EEOC denied Khattak's complaint, finding that Khattak failed to file a timely claim.  *Id.* ¶ 52.  Khattak proceeded to file the underlying Complaint in this case on October 28, 2019.  ECF No. 1.  The Agency filed a motion for summary judgment on March 26, 2020, claiming that Khattak had failed to exhaust his administrative remedies under Title VII.  ECF No. 7.  The previously-assigned District Judge denied the Agency's motion, finding that a genuine issue of material fact remained as to the timing of Khattak's reasonable suspicion of the alleged discriminatory non-selection.  *See* Mar. 16, 2021 Min. Order.  On March 3, 2023, the Agency filed another motion for summary judgment.  ECF No. 28.

## ANALYSIS

### I.   Standard of Review

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The mere existence of some factual dispute is insufficient on

its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Anderson*, 477

U.S. at 247–48.  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  The

Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law*.*"

*Id.* at 251–52.

On summary judgment, a reviewing court must view the evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in its favor.  *See, e.g.*, *Stoe

v. Barr*, 960 F.3d 627, 629 (D.C. Cir. 2020).  The non-movant, however, "must do more than

simply show that there is some metaphysical doubt as to the material facts";  instead, it must point

to specific facts in the record that reflect a genuine issue warranting trial.  *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986).  In doing so, the non-movant must cite competent, admissible evidence and may

not rely on "statements that are impermissible hearsay or that are not based on personal

knowledge."  *Shuler v. District of Columbia*, 744 F. Supp. 2d 320, 327 (D.D.C. 2010) (internal

quotation marks and citation omitted).  Conclusory assertions offered without any evidentiary

support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C.

Cir. 1999).

## II.     Title VII of the Civil Rights Act of 1964

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate

against its employees and applicants for employment based on race, sex, or national origin, among

other characteristics.  42 U.S.C. §§ 2000e-2(a); *see also Figueroa v. Pompeo*, 923 F.3d 1078, 1086

(D.C. Cir. 2019); *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  For

claims of intentional discrimination, "[p]roof of illicit motive is essential," and the employee "at

all times" maintains the burden to prove "that the defendant intentionally discriminated against" him. *Figueroa*, 923 F.3d at 1086 (quoting *Segar v. Smith*, 738 F.2d 1249, 1265, 1267 (D.C. Cir. 1984)). Under the statute, "national origin" is construed as "the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973).

Where there is only circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework governs the analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *see also Figueroa*, 923 F.3d at 1086 (citing *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)). Under this framework, the plaintiff "must first make out a prima facie case" of discrimination. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). To do so, the plaintiff must show that: (1) he is part of a protected class under Title VII; (2) he suffered a cognizable adverse employment action; and (3) the action gives rise to an inference of discrimination. *Wheeler*, 812 F.3d at 1113-14. The burden next shifts to the employer to "come forward with a legitimate reason for the challenged action." *Iyoha*, 927 F.3d at 566. Finally, if the employer carries its burden of production, the "burden then shifts back" to the employee, who must prove that, despite the employer's proffered reason, he has been the victim of intentional discrimination. *Wheeler*, 812 F.3d at 1114.

"When the employer properly presents a legitimate, nondiscriminatory reason, the District Court 'need not—*and should not*—decide whether the plaintiff actually made out a prima facie case.'" *Figueroa*, 923 F.3d at 1087 (quoting *Brady*, 520 F.3d at 494). Instead, the Court should focus on one central question: whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ." *Brady*, 520

F.3d at 494.  To do so, the plaintiff must demonstrate that a "reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason."  *Walker v. Johnson*, 798 F.3d 1085, 1096 (D.C. Cir. 2015).  Further, "courts are without authority to second-guess an employer's personnel decision absent demonstrably discriminatory motive."  *Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)) (internal quotation marks omitted).  Accordingly, "[o]nce the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers."  *Fischbach*, 86 F.3d at 1183 (internal quotation marks omitted).

### III.    Khattak's National Origin Discrimination Claim

Khattak claims that VOA did not select him for the international broadcaster position because of his Pakistani origin.  *See generally* ECF No. 33.  Specifically, Khattak argues that discrimination pervaded VOA's hiring process, as reflected by Khattak's superior qualifications compared to Lami's, Ayazi's conduct, and procedural irregularities within the selection process. *Id.*  VOA responds that it had a legitimate, nondiscriminatory reason for not selecting Khattak: that Lami was better qualified for the position.  ECF No. 28-1 at 18–21.[7]

### A.  Evidentiary Objections to the Khattak and Shah Declarations.

---

[7]      For purposes of this analysis, the Court "need not–*and should not*–decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.  Rather, in considering an employer's motion for summary judgment . . . [the Court] must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . national origin?"  *Brady*, 520 F.3d at 494 (emphasis in original).

Before reaching the substance of Khattak's claim, the Court must first address the Agency's evidentiary objections.  Khattak's opposition to the Agency's motion relies on two recent declarations: one from Khattak himself, ECF No. 33-3, and the other from Bakhtawar Shah, ECF No. 33-5, another broadcaster within the Deewa Service.  *See generally* ECF No. 33.  Khattak asserts that both declarations provide evidence of discriminatory animus on the part of VOA and Ayazi toward Pakistani Pashto speakers.  *Id.* at 7.

The Agency argues that Khattak's declaration is inadmissible because it is a "sham affidavit" because it clearly contradicts Khattak's prior sworn testimony.  ECF No. 34 at 11.  As for the Shah declaration, the Agency argues that it is inadmissible because Khattak failed to adhere to Rule 26(a) in his initial disclosures.  *Id.* at 8-10.  According to the Agency, even if the Court were to consider the substance of the declarations, none of the allegations alleged in the declarations create a genuine issue of material fact as to whether VOA honestly believed that Lami was more qualified for the broadcaster position.  *Id.* at 15.  The Court will address each declaration in turn.

Under the "sham affidavit rule," a party cannot create an issue of material fact by contradicting prior sworn testimony using an amended affidavit or declaration unless the party offers "persuasive reasons for believing the supposed correction is more accurate than the prior testimony."  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007).  Courts have applied the sham affidavit rule when "the affidavit [or declaration] . . . clearly contradict[s] prior sworn testimony, rather than clarif[ies] confusing or ambiguous testimony, and the contradiction lacks credible explanation."  *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 160 (D.D.C. 2008) (internal quotation marks and citation omitted); *see also Johnson v. Shinseki*, 811 F. Supp. 2d 336, 342 (D.D.C. 2011) (holding that the sham doctrine applies where

the declaration "clearly contradict[s] prior sworn testimony . . . and the contradiction lacks credible explanation").  The Agency argues that this Court should not consider Khattak's more recent declaration because it "unambiguously contradicts his sworn testimony at his prior deposition . . . ."  ECF No. 34 at 11.

The Agency is incorrect.  At his deposition, Khattak testified that "other than the one meeting that occurred sometime in 2016 with Mr. Ayazi and Mr. Jan," Khattak never witnessed "any other comments allegedly made by Mr. Ayazi where he expressed open hostility and disrespect" toward Pakistani Pashtuns.   ECF No. 34-4, Khattak Dep. Tr. 161:10–163:2.  Importantly, however, Khattak also asserted that colleagues told him about instances of Ayazi attempting to "correct the language" of Pashto-speaking Pakistanis, which Khattak construed as "unprofessional" and "inappropriate."  *Id.* 162:2–163:15.  In his most recent declaration, Khattak stated that he was aware of "multiple occasions" in which Ayazi spoke with disrespect toward Pakistani Pashto speakers and that Ayazi would "try to correct the Pakistanis' language on numerous occasions."   ECF No. 33-3 ¶ 103.  These statements do not contradict each other.  In both settings, Khattak alleges that others told him about multiple instances of Ayazi being disrespectful towards Pakistani Pashtuns, including Ayazi's attempts to correct their language.  Accordingly, the Court will consider Khattak's declaration.

The Agency argues that the Court should not consider the Shah declaration because Khattak failed to abide by Federal Rule of Civil Procedure 26.  ECF No. 34 at 8-11.  Specifically, it argues that Khattak did not list Shah among his initial disclosures; rather, Khattak listed Shah in an answer to an interrogatory in which Khattak identified Shah among eighteen individuals who purportedly had first-hand knowledge of each alleged discriminatory act.  ECF No. 28-13 (Plaintiff's Responses to Defendant's First Interrogatories).  Therefore, according to the Agency,

the Court should exclude consideration of the declaration under Federal Rule of Civil Procedure 37 because Khattak used it to "supply evidence on a motion [and] at a hearing to support [his] claims." *See* Fed. R. Civ. P. 26(a)(1)(A)(i); *see also* Fed. R. Civ. P. 37(c)(1) (prohibiting a party from using this information or a witness if the party failed to disclose under Rule 26(a)(1) unless the "failure was substantially justified or is harmless"). The Agency's argument is unavailing. Khattak's failure to list Shah in Khattak's initial disclosures is harmless, as there is no dispute Khattak provided Shah's identity more than four months before the close of discovery. *See* Fed. R. Civ. P. 37(c)(1); ECF No. 28-13. The Agency had a reasonable opportunity to depose Shah during those four months. Additionally, the Agency's argument that Khattak "bur[ied]" Shah in a list of eighteen names in the answer to an interrogatory is unpersuasive. *See* ECF No. 34 at 8 n.4. As such, the Court will not exclude the Shah declaration.

## B. The Agency's Legitimate, Nondiscriminatory Reason for Lami's Selection.

Under the second prong of the *McDonnell Douglas* test, an employer must provide a legitimate, nondiscriminatory reason for its action.[8] *McDonnell Douglas Corp.*, 411 U.S. at 802. VOA easily satisfies this burden. VOA's "clear" and "reasonably specific" nondiscriminatory reason for hiring Lami was his qualifications, including his fluency in Pashto and his extensive prior work experience in the target region. *See Figueroa*, 923 F.3d at 1088 (evidence adduced by the employer must be a "clear and reasonably specific explanation") (quoting *Segar*, 738 F.2d at 1269 n. 13). In selecting Lami over Khattak, VOA relied on Lami's "16-plus years of experience,"

---

[8] An employer satisfies its burden of providing a legitimate, nondiscriminatory reason for its actions when (1) it "produce[s] evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) the factfinder is "reasonably […] able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) the "nondiscriminatory explanation [is] . . . facially credible in light of the proffered evidence"; and (4) the evidence […] present[s] a "clear and reasonably specific explanation," such that the employee has "a full and fair opportunity to attack the explanation as pretextual." *Figueroa*, 923 F.3d at 1087–88.

his "nine years with [VOA] in an identical position [. . .] as the vacancy," and his "fluency in the position's target language . . ."  ECF No. 28-1 at 20.  VOA's Selection Memorandum identifies Lami as having "superior experience and the ideal skill set" for the Deewa Service.  ECF No. 28-22 at 1.  Further, the memorandum cites to Lami's "experience covering political and cultural developments in Afghanistan," and explains that this experience "exceed[s]" any of the other candidates and "position[s] him well to continue reporting on issues in the Afghanistan-Pakistan border region for VOA."  *Id.*  VOA also relied on the recommendations of the interview panel in its selection of Lami.  *See generally* ECF No. 28-16; *see also* ECF No. 28-1 at 18–19.  Each panelist provided detailed justifications as to why Lami was the best qualified.  *See generally* ECF No. 28-16.

There is no dispute that VOA's stated justification for Khattak's non-selection is clear, facially credible, and supported by admissible evidence.

### C. Khattak has Failed to Offer Sufficient Evidence for a Reasonable Juror to Conclude that the Proffered Reason for His Non-Selection was Pretext for National Origin Discrimination.

At the third step of the *McDonnell Douglas* test, Khattak's burden is to identify a genuine dispute of material fact that VOA's stated reason for his non-selection was mere pretext and that the actual reason was discrimination based on Khattak's national origin.  *McDonnell Douglas Corp.*, 41 U.S. at 804; *Morris*, 825 F.3d at 671.  Khattak makes a number of arguments to demonstrate that VOA's nondiscriminatory reason was pretext for national origin discrimination. *See generally* ECF No. 33.  Even drawing "all justifiable inferences . . . in [Khattak's] favor," none of his arguments demonstrate that "a reasonable jury not only could disbelieve the employer's reasons but also could conclude that the employer acted, at least in part, for a prohibited reason." *See Walker*, 798 F.3d at 1096.  The Court will address Khattak's principle arguments in turn.

> i.     *Khattak and Lami's Comparative Qualifications*

Khattak's primary argument is that he was significantly better qualified for the position than Lami, thereby raising an inference of discrimination.  *See generally* ECF No. 33 at 18-25. Khattak argues that his qualifications are superior given the Deewa Service's target audience and region—one with which allegedly Khattak, unlike Lami, was intimately familiar.  ECF No. 33 at 22–23.  Moreover, Khattak claims that the broadcaster position required fluency in a certain dialect of Pashto, one that Khattak speaks and Lami does not.  *Id.* at 23.  VOA responds that Khattak improperly substitutes his own subjective understanding of the relevant job requirements to paint this asserted disparity in qualifications.  ECF No. 34 at 16–19.  According to VOA, even if the broadcaster position had such requirements, Lami was the superior candidate.  *Id.* at 19.

To infer pretext, any qualifications gap between a plaintiff and the selectee must be "great enough to be inherently indicative of discrimination."  *See Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) ("If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job . . . the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate . . . .").  A court may look to the totality of the decision-making process, but absent evidence of animus, a court cannot second guess how an employer weighed the various qualifications of candidates.  *Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007).  An applicant's subjective understanding of the job qualifications is irrelevant to the broader inquiry.  *See Dyer v. McCormick & Schmick's Seafood Restaurants, Inc.*, 264 F. Supp. 3d 208, 229 (D.D.C. 2017) (noting that portions of the plaintiff's deposition in which he provided his own subjective assessment of his credentials were "largely irrelevant for purposes of establishing discriminatory motive").

Khattak has failed to provide sufficient evidence to establish a genuine issue of material fact as to whether VOA honestly believed that Lami was more qualified for the broadcaster position or that VOA's hiring process was motivated by national origin discrimination. For one, Khattak's argument that familiarity with the Northwest Frontier Province and the "target region," which *Khattak* defines as only or primarily including the Pakistani side of the border, was a prerequisite for the position is misplaced. *See* ECF No. 33 at 18–22. The record does not support this. First, Khattak's definition or distinction is not provided in the relevant vacancy announcement. Moreover, VOA points to various instances where the Agency's understanding of the "Northwest Frontier Province" includes the broader Afghanistan-Pakistan border region. *See e.g.*, ECF No. 33-7, Phillips Dep. Tr. 59:3–9 (testifying that he understood the Position Description to be targeted toward the Northwest Frontier Province and Pakistan-Afghanistan border region); *see also* ECF No. 33-9 at 17 (Takar originally recommending Bunairee after the First Vacancy Announcement based on Bunairee's "inside-out knowledge of the target region Afghanistan/Pakistan border areas"); ECF No. 33-4 at 1 (2023 Program Review of VOA's Deewa Service, stating that "VOA Deewa creates radio, video and digital programming for the Pashto-speaking North-western region of Pakistan and neighboring Afghanistan"). Khattak fails to provide evidence to rebut VOA's stated understanding of the phrase "target region." Khattak's subjective understanding of the position description is irrelevant and cannot create a genuine issue of a material fact. *See Jackson*, 496 F.3d at 709 (quoting *Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006)) ("Questioning [the employer's] hiring criteria is not within the province of the Court").

By the same token, Khattak's apparent argument that the VOA specifically sought in the vacancy announcements a speaker of the Pashto dialect from the Northwest Frontier Province *of*

*Pakistan* is off the mark.  *See* ECF No. 33 at 23.  Each of the job postings required fluency in only English and Pashto, not a specific dialect of Pashto.  *See* ECF No. 28-8; ECF No. 28-14; ECF No. 28-20.  The text of the Position Description simply stated that candidates must be able to translate English to "idiomatic Pashto."  ECF No. 28–10.  This does not require fluency in a particular Pashto dialect.  Khattak fails to point to evidence that "idiomatic Pashto" meant a particular dialect and, specifically, that it meant *Khattak's* dialect.[9]  VOA noted in its pleadings and at the hearing[10] that members of the target audience spoke numerous dialects of Pashto, more akin to regional accents.  ECF No. 28-1 at 24.  Even if mastery of a certain dialect were required, Lami testified that he grew up speaking a dialect similar to that spoken in the Pakistani region of the Northwest Frontier Province.  ECF No. 28-5, Lami Dep. Tr. 27:21–28:7.

VOA evaluated both Khattak and Lami on multiple competencies in addition to their experience in the target region and their language proficiency.  ECF No. 34 at 17; *see also* ECF No. 28-20 at 1 (listing responsibilities which included journalism, English and Pashto proficiency, social media, and knowledge of the target area).  VOA states that it selected Lami based on several factors.  ECF No. 28-16 at 3–5.  For example, Lami worked as a journalist for other outlets in the Afghanistan-Pakistan region since 2005 and at VOA since 2007, whereas Khattak's only journalistic experience was working at the Deewa Service since 2009.  *See* ECF No. 28-16;

---

[9]     In support of this assertion, Khattak cites to his own declaration as well as that of Shah's. *See* ECF No. 33 at 23 ("Witnesses Shah and Khattak state that Lami did not even speak the requisite language (the Pakistani Pashtun dialect) and, therefore, could not be better qualified than Khattak, who did.").  Khattak's reliance on Shah's declaration is misplaced.  Shah was not part of the hiring process, rendering his opinion as to the "requisite language" irrelevant.

[10]    At the motions hearing, Khattak ultimately agreed with the Court's definition that idiomatic means "peculiar to or characteristic of a particular language or dialect."  *Idiomatic*, Dictionary, https://www.dictionary.com/browse/idiomatic (last visited Sept. 29, 2023).  Plaintiff, however, was unable to point to any evidence that VOA specified a particular dialect in the Position Description or any of the vacancy announcements.

*compared* ECF No. 28-17 at 2–4, *with* ECF No. 28-6 at 3–4.  Further, VOA pointed to Lami's fluency in multiple languages and his knowledge of local and regional politics.  ECF No. 28-16 at 4–5.  Lami and Khattak's qualifications present, at the very best, a close call, and, therefore, fail to yield an inference of discrimination.  *See Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006) (holding that "close calls" between candidates "fail to move a case beyond summary judgment").  Without more, the Court must defer to the employer's decision as to which qualities of the job it weighs more heavily.  *See id.*  Accordingly, Khattak's subjective interpretation of the job qualifications and his own superior qualifications, without more, is insufficient to create a genuine dispute of material fact that would preclude summary judgment.  *See Dyer*, 264 F. Supp. 3d at 229.

### ii.        *Ayazi's Workplace Comments and Bias Evidence*

Khattak also argues Ayazi made comments that "indicate bias against the Pakistani Pashto language," and bear "upon his discriminatory preference" for Afghans over Pakistanis.  ECF No. 33 at 8.  Khattak fails, however, to connect Ayazi's isolated comments or purported personal relationships with other Afghans to any discriminatory animus toward Khattak in the hiring process.  *See Walker*, 798 F.3d at 1093 ("The evidence of record must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one.").  Even if the Court were to find Ayazi's comments reasonably lead to an inference of discrimination, Khattak fails to point to evidence, beyond speculation, that shows Ayazi influenced the three-member panel that selected Lami for the position.  *See also Hampton v. Vislack*, 685 F. 3d 1096, 1101-02 (D.C. Cir. 2012) (finding insufficient evidence of pretext when a plaintiff fails to present evidence that an alleged discriminator influenced an employment decision-maker).

Khattak primarily relies on instances where Ayazi commented on employees' use of language to allege Ayazi was biased against Pashto speakers.  One such instance is a staff meeting in 2016 in which Khattak and Shah witnessed Ayazi tell Sadaqat Jan, a broadcaster within the Deewa Service, that his Pashto was not accurate and was corrupted by Urdu.  ECF No. 33-5 ¶ 72. Khattak testified that he witnessed Ayazi tell Mr. Jan that "nobody understand[s] [your Pashto] or nobody likes it."  ECF No. 34-4, Khattak Dep. Tr. 165:6–7.  Khattak testified that he was aware from other colleagues that Ayazi would "act[] like a headmaster in school . . . [and] try to correct the language which we were using in our broadcast, in our writing."  *Id.* Khattak Dep. Tr. 162:10–17.

The Agency argues that these comments do not reflect broader bias.  ECF No. 34 at 14 ("At most, Plaintiff has adduced evidence that Ayazi criticized the way certain Pakistani staff speak or write in Pashto on a few occasions separate and apart from the hiring decision at issue."). Khattak admitted in his deposition that Ayazi's comments occurred only "in the context of reviewing work product" pertaining to the "contents or substance of an article written for the Deewa Service."  ECF No. 28–3, Khattak Dep. Tr. 165:21-166:4.  Khattak further acknowledged that Ayazi maintained editorial control of the Deewa Service and was not "prohibited from viewing and commenting on the content being put out by the broadcasts in his language service."  *Id.* 164:14–165:1; 170:4–10; ECF No. 34 at 9 (citing Ex. C – Khattak Dep. Tr. 165:21-166:5) (admitting Ayazi's comments were made in the context of reviewing work product, but maintaining that it was not Ayazi's duty to review such work product).

Even if bias could be reasonably inferred from Ayazi's editorial critiques of the substance of Deewa Service employees' work product, Khattak is still required to show that Ayazi's bias impacted the decision-makers' selection of Lami.  Khattak has failed to show any such connection,

let alone one necessary to raise a genuine issue of material fact.  VOA justifies Lami's selection by the unequivocal recommendation of the interview panel.  *See* ECF No. 28-16 (describing the two candidates as "the most suitable").  Khattak's assertion that Ayazi orchestrated the hiring process to discriminate against Pashto-speaking Pakistanis—when Ayazi neither set up the panel nor served on it—requires inferential leaps that must be supported by evidence, not mere speculation.  *See Walker*, 798 F.3d at 1093.

Khattak attempts to buttress his claim that Ayazi and VOA were biased towards Pakistanis by pointing to an alleged personal friendship between Ayazi and the Lamis and Alikozai.  ECF No. 33 at 27–31.  Khattak argues that Ayazi's relationships with other Afghans create an inference of bias.  *Id.*  This argument falls short.  Ayazi's personal relationships with other Afghans reflect, at most, favoritism or nepotism, neither of which is actionable under Title VII.  *See Richard v. Bell Atlantic Corp.*, 164 F. Supp. 2d 10, 20 (D.D.C. 2001) (stating favoritism "is not actionable under Title VII"); *Robinson-Reeder v. American Council on Education*, 532 F. Supp. 2d 6, 14–15 (D.D.C. 2008) (noting nepotism is not actionable under Title VII).  Even taking all evidence in a light most favorable to Khattak, Khattak fails to make the requisite inferential link to demonstrate that Ayazi's friendships led to discrimination against Khattak in the hiring process.

In fact, the evidence reflects the opposite.  Most importantly, it is undisputed that it was *Ayazi* who signed off on Khattak's selection for the initial vacancy of the international broadcaster position before the hiring freeze.  ECF No. 33-9 at 14 (Memo from Ayazi to Kelu Chao selecting Khattak for the position).  Ayazi's purported discriminatory preference for hiring only Afghans is refuted by this undisputed fact.  *C.f. Thompson v. HICAPS Inc.*, 628 F. Supp. 2d 303-304 (D.D.C. 2022) (articulating the "same actor" inference against discrimination when the same person who made an initial decision to hire later becomes the alleged discriminator); *Waterhouse*, 298 F.3d at

996.  Without more, there is no genuine dispute as to whether Ayazi's alleged bias led to a discriminatory hiring process that favored Lami over Khattak.

### iii.   *Variance From Official Procedures*

To suggest pretext, Khattak also points to purported procedural deviations in VOA's internal hiring process.  ECF No. 33 at 31–37.  Specifically, Khattak raises the following: (1) VOA's failure to proceed with Takar's pre-hiring freeze selection of Khattak; (2) VOA's refusal to conduct interviews after the Third Vacancy Announcement; (3) the composition of the interview panel; and (4) VOA's assignment of Phillips as the Selecting Official rather than Iftikhar Hussain. *See id.* at 32–36.

An employer's adverse action that is "inconsistent with the . . . process that [an employer] established" may show pretext.  *Perry v. Donovan*, 733 F. Supp. 2d 114, 120 (D.D.C. 2010) (quoting *Lathram v. Snow*, 336 F. 3d 1085, 1093 (D. C. Cir. 2003).  For each purported deviation, however, Khattak fails to point to evidence in the record suggesting that VOA in fact deviated from its official procedures.  Indeed, Khattak does not identify any codified procedures that required VOA to act as Khattak suggests.  For instance, the record reflects that it was within VOA's discretion to consider new candidates after the hiring freeze, rather than proceed with Takar's pre-freeze selection.  *See* ECF No. 33 at 32 (Khattak conceding that it was "entirely [VOA's] choice" and "optional for Deewa to go ahead with prior selections.").  Moreover, the Agency had ample discretion regarding the selection of new employees, including, as the Agency pointed out at the hearing, the lack of a requirement to enlist an interview panel after the third vacancy positing.  *See* ECF No. 33 at 33 (Khattak conceding that interviews were not required to select a candidate).  Additionally, there is no evidence to suggest that VOA was required to appoint a certain individual to serve as Takar's replacement as selecting official.  Khattak merely suggests that VOA "should

have" done so.  *See* ECF No. 33 at 35 ("Ayazi should have made . . . the highly-successful performing Hussain the selecting official . . . .").  Khattak speculates that VOA appointed Phillips based on national origin, yet offers no evidence in support.  In fact, the only evidence in the record as to VOA's removal of Takar as the selecting official reflect that VOA did so to remedy potential national origin discrimination on Takar's part due to Takar's comments, not as a deliberate act to thwart Khattak's selection.  *See* ECF No. 28-18.   As Khattak has failed to proffer evidence that VOA did not adhere to specific hiring procedures, the Court can neither infer discrimination nor second guess VOA's personnel decision on this record.  *See Waterhouse*, 298 F.3d at 995 (D.C. Cir. 2002).

iv. *Miscellaneous Arguments*

Finally, Khattak makes additional catch-all arguments in an attempt to demonstrate pretext, including that: (1) Niala Mohammad's selection reflected pretext because she was unable to write in Pashto; (2) VOA delayed in announcing Lami's selection so as to run the clock on possible EEOC claims; (3) VOA's failure to disclose the 2023 VOA Deewa Service Review reflected pretext because this report, completed in 2023, noted that Lami's accent is difficult for Pashto-speaking Pakistanis to understand; and (4) VOA should have disclosed prior EEOC findings against Ayazi in *Madlyn F. v. Chao* because they are parallel to this case.  *See* ECF No. 33 at 26, 38–40.

Even viewing all evidence in the light most favorable to Khattak, his arguments do not warrant further consideration as each fails to demonstrate national origin discrimination in the hiring process of Lami.  None of the arguments standing alone or viewed in tandem create a genuine issue as to whether discriminatory animus motivated Khattak's non-selection or discount VOA's honest belief that Lami was the superior candidate.

Because Khattak has failed to demonstrate that a reasonable juror could find that VOA's stated legitimate, nondiscriminatory reason was mere pretext for national origin discrimination, the Court will grant the Agency's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Agency's motion for summary judgment, ECF No. 28.  A separate order will issue.

**SO ORDERED**.


Date: September 30, 2023

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE